**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ABBOTT LABORATORIES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 18-6907 |
| v. | ) |
| | ) Judge Charles P. Kocoras |
| BLAYNE FLECK, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**ABBOTT LABORATORIES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR A
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

# INTRODUCTION

Abbott Laboratories ("Abbott") brings this suit to prevent its employee, Blayne Fleck ("Fleck") from taking its strategic "playbook" and using it to benefit a direct competitor, Nevro Corp. ("Nevro"). Just three weeks ago, Fleck led a team that developed Abbott's 2019 strategic plan, including its pricing, marketing, and geographic expansion strategies, for the highly competitive Chronic Pain Therapies market. All the while, Fleck was in secret discussions to join Nevro, one of Abbott's three major competitors in that market. Fleck's duplicitous conduct violates his Abbott Employee Agreement, inevitably misappropriates Abbott's trade secrets, and will cause Abbott irreparable harm that cannot be overstated or undone.

Fleck knows this, but he believes his commitments to Abbott are irrelevant. Indeed, he has gone so far as to taunt his former managers, suggesting that he does not need to comply with the non-compete restrictions in his Abbott Employee Agreement. He is, of course, wrong. If Fleck wants to leave Abbott, he can use his marketing skillset and expertise to work in *any* role, for *any* company, *anywhere* in the world, that does not compete with Abbott in the Chronic Pain Therapies market. It is no accident that he chose Nevro, one of Abbott's three major competitors in the market, and a struggling company that would benefit immensely from learning Abbott's 2019 playbook. Abbott is entitled to a temporary restraining order and preliminary and permanent injunctive relief to prevent the irrevocable harm that Fleck's behavior will cause.

# FACTUAL BACKGROUND

Abbott and Nevro are two of only four companies (holding a combined 98% of market share) competing in the highly competitive national and global Chronic Pain Therapies market, which includes spinal cord stimulation ("SCS") therapies. (Oct. 14, 2018 Decl. of Laura Sterling,

attached as Ex. A, ¶¶ 6, 8; Oct. 14, 2018 Decl. of Christopher Bingham, attached as Ex. B, ¶ 8.)[1] Unlike the other competitors in the Chronic Pain Therapies market (which, like Abbott, have other products), Nevro offers only SCS therapies. (Ex. A, ¶ 8; Ex. B, ¶ 18.) The company is not doing well; Nevro has lost nearly half its value in the past year. (Ex. A, ¶ 8.)

At Abbott Fleck worked in a senior-level, global marketing role, responsible for Abbott's Chronic Pain Therapies, including SCS.[2] (*Id.* ¶ 13; Ex. B, ¶ 14.) His Employee Agreement (the "Agreement," attached as Ex. C) contains, among other provisions, a promise that he would not compete with Abbott for 12 months after leaving Abbott (the "Non-Compete Provision"):

> 9. **Non-Competition.** Employee shall not, during Employee's employment and twelve (12) months after Employee's termination for any reason, in each country in which Abbott conducts business . . .:
>
> (a) participate in, manage, supervise, or provide services to a Competing Business: (i) that are the same as or similar in function or purpose to any services Employee provided to Abbott during the last two years of Employee's employment with Abbott; or (ii) that are otherwise likely to result in the use or disclosure of Confidential Information, notwithstanding Employee's undertaking to the contrary . . .

(Ex. C, § 9(a); Ex. A, ¶ 20.)[3] Fleck's joining Nevro would breach both of Sections 9(a)(i) and (ii).

*Fleck's Role at Abbott.* Fleck started working for St. Jude Medical, Inc. ("St. Jude") in 2014 in a marketing role (Ex. A, ¶ 12), and continued in marketing after St. Jude was acquired by Abbott in 2017.[4] Fleck's responsibilities steadily increased at St. Jude and then Abbott, until 2018

---

[1] Abbott is a global and diversified company made up of different divisions and business segments. (Ex. A, ¶ 5.)

[2] Although Fleck's official title was Product Manager for Global DRG/RF, Fleck had broad and deep responsibilities related to all Chronic Pain Therapies, including SCS. (Ex. A, ¶ 13.)

[3] The Agreement also included a Non-Disclosure Provision, and other acknowledgments and promises, all of which are incorporated herein by reference. (Ex. C.)

[4] While at St. Jude, Fleck executed an Employment Agreement that similarly prohibited him from working for a competitor for a period of 12 months. (*See* Employment Agreement, attached as Ex. D, § 10.)

when he held a global marketing role for Abbott's Chronic Pain Therapies, including SCS. (Ex. A, ¶ 13.) As part of his global marketing role, just last month (September 2018), Fleck led the team that created and developed Abbott's 2019 Global Chronic Pain Marketing Plan (the "2019 Marketing Plan") for Chronic Pain Therapies for the next 12 to 18 months. (Ex. A, ¶ 14.) That 2019 Marketing Plan includes, among other things:

(a) Abbott's five enumerated "Operating Imperatives" for achieving its global revenue and growth targets for 2019. For example, one of the "Operating Imperatives" centers around Abbott's insights into the barriers that currently are reducing patient use of Chronic Pain Therapies, and its strategies for combating those barriers to increase use of its products. This "Operating Imperative" is accompanied by ten initiatives for executing that operating imperative, each of which includes a detailed description of the initiative, the tactics for implementing it, the geographic region where it will be implemented and the timing and budget for implementation;

(b) Abbott's proprietary insights into the combinations utilized by its customers in the Chronic Pain Therapies market – that is, what percentage of its customers use RF, DRG, or SCS only; what percentage use a combination of two of those therapies, and what percentage use all three therapies. Based on these insights, Abbott evaluated and developed a new sales and pricing approach to drive further growth for Abbott in the Chronic Pain Therapies market;

(c) Abbott's intended marketing messaging to patients – *i.e.* how it plans to advertise its Chronic Pain Therapies in 2019 – to differentiate Abbott's Chronic Pain Therapies from its competitors' products and drive consumers to purchase Abbott's products;

(d) Abbott's 2018-2019 product map, including the timing of projected regulatory approvals for various therapies within the Chronic Pain Therapies market;

(e) Abbott's competitive insights into the Chronic Pain Therapies market, including key changes in the market since the development of the 2018 Chronic Pain Marketing Plan and implications of these key changes for Abbott's marketing and sales strategies; and

(f) Abbott's analysis of the competitive landscape in the Chronic Pain Therapies market, including anticipated market launches and regulatory approvals, and its assessment of each of its competitors' strength in the market.

(*Id*.) For the past nine months, Fleck was also the marketing representative on the team that developed Abbott's geographic expansion plan for 2019 (the "2019 Geographic Expansion Plan"),

including analysis of the business case for expanding to a particular region, and anticipated performance metrics in each region. (*Id*. ¶ 16.)

Fleck also has intimate knowledge of Abbott's Chronic Pain Therapies' pricing "pain points" – that is, Abbott's margins and the discounts it is able and willing to offer in certain circumstances, in certain regions, and/or for certain accounts. (*Id*. ¶ 19.) That inside information would allow a competitor like Nevro to determine how aggressively it should price its products to compete against Abbott. (*Id*. ¶ 24.)

Because secrecy is critical to Abbott's strategic success in this highly-competitive market, the 2019 Marketing Plan and 2019 Geographic Expansion Plan were accessible to only a small number of Abbott employees, all of whom were bound by non-disclosure restrictions. (*Id*. ¶¶ 9-10, 15, 17.) Abbott goes to great lengths, and invests millions of dollars each year, to maintain the secrecy of its trade secrets and other confidential information. (Ex. B, ¶¶ 10-11.) Specifically, Abbott has security systems for both its physical offices and electronic databases, and it utilizes measures including secure access-restricted SharePoint drives, password protection, an Electronic Media Use Policy, and non-compete and non-disclosure agreements. (*Id*. ¶¶ 11-12.)

*Fleck's Scheme.*  Incredibly, when Fleck agreed to lead the team developing the 2019 Marketing Plan, he was already planning to leave Abbott and join Nevro. (Ex. A, ¶¶ 26-28.) Indeed, Fleck had been in discussions to join Nevro since at least July 2018, when he apparently received a non-disclosure agreement from Nevro in connection with his employment discussions. (*Id*. ¶ 29.) Of course, Fleck did not share his plans with Abbott. (*Id*. ¶¶ 26-28.) Instead, he took on even greater responsibilities, giving him access to additional key strategic information (the 2019 Marketing Plan) that would make him even more valuable to Nevro. (*Id*. ¶ 27.) Then, on October 3, 2018, just eight days after completing Abbott's 2019 Marketing Plan, Fleck tendered his notice

of resignation. (*Id*. ¶¶ 26-27.) Fleck then taunted his soon-to-be former manager, suggesting that there is nothing Abbott can do to stop him from working at Nevro because it is in California.[5] (*Id*. ¶ 28.)

Fleck's scheduled last day of employment with Abbott is October 17, 2018, and Abbott understands that his employment with Nevro will begin imminently. (*Id*. ¶ 26.) Because of the nature of the Chronic Pain Therapies market, Fleck's employment will instantly allow Nevro to undermine Abbott in the market, by profiting from the proprietary and time-sensitive 2019 Marketing Plan, the 2019 Geographic Plan, Abbott's pricing strategies, and other confidential and trade secret information that Abbott invested significant resources to develop. (*Id*. ¶¶ 9-10, 21-25, 30-34; Ex. B, ¶¶ 19-22.) Abbott brings this Motion to prevent this devastating crucial and irreparable harm from occurring.

## ARGUMENT

The purpose of a temporary restraining order is to maintain the *status quo* until a hearing can be held on an application for a preliminary injunction. *Coca-Cola Co. v. Alma-Leo U.S.A., Inc.,* 719 F. Supp. 725, 726 (N.D. Ill. 1989). A party seeking a temporary restraining order must make a threshold showing that it (1) has some likelihood of succeeding on the merits; (2) has no adequate remedy at law; and (3) will suffer irreparable harm if temporary relief is denied.[6] *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992); *OptionsCity Software, Inc. v. Baumann*, Case No. 15 C 5019, 2015 WL 3855622, at *3 (N.D. Ill. June 19, 2015). If this threshold

---

[5] Unfortunately for Fleck, the Agreement applies Illinois law. (Ex. C, § 15.) Fleck cannot end-run that provision by working for a California-based company. *Integrated Genomics, Inc. v. Kyrpides*, No. 06 C 6706, 2010 WL 375672, at *7 (N.D. Ill. Jan. 26, 2010) (applying Illinois law where "California's only connection to this dispute is as [the employee's] residence after leaving [the employer's] employ.").

[6] The standard for a preliminary injunction is identical. *Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc.*, No. 01 C 585, 2001 WL 128164, at *1 (N.D. Ill. Feb. 9, 2001).

is met, the court applies a "sliding scale" approach and weighs these considerations, as well as the balance of harm to the parties and the public interest, to determine whether to grant injunctive relief. *Abbott Labs.*, 971 F.2d at 11-12.

This case is tailor-made for a temporary restraining order. Fleck has not yet begun working at Nevro, so a temporary restraining order is a meaningful remedy. It would preserve the status quo and prevent Fleck from causing irreparable harm by further breaching his Agreement and using Abbott's trade secrets to Nevro's advantage.

**I. Fleck's Employment At Nevro Will Cause Abbott Irreparable Harm.**

If Nevro, through Fleck, learns, or benefits from, Abbott's 2019 Marketing Plan or 2019 Geographic Expansion Plan, it will be impossible to unring that bell. *PepsiCo, Inc. v. Redmond*, No. 94 C 6838, 1996 WL 3965, at *30 (N.D. Ill. Jan. 2, 1996) ("[J]ust as it is impossible to unring a bell, once disclosed, trade secrets and confidential information lose their secrecy forever[.]").[7] Nevro will have access to Abbott's proprietary insights into the Chronic Pain Therapies market, along with its *pricing strategies*, *planned marketing messages*, *timing of product releases*, *analyses of competitors*, and *valuation of different geographic regions*. (*See supra* at 3-4.) In short, Nevro will have the roadmap it needs to unfairly deprive Abbott of its hard-earned competitive advantage. (Ex. A, ¶¶ 21-25, 30-34; Ex. B, ¶¶ 19-22.)

Indeed, it appears that was Fleck's plan all along. He waited until the 2019 Marketing Plan was complete to tender his resignation despite having been in discussions with Nevro for months. This misappropriation would allow Nevro to anticipate Abbott's strategies and subvert them in

---

[7] The district court in *PepsiCo, Inc.* issued a preliminary injunction barring the former employee from working for a competitor. 1996 WL 3965, at *1. The Seventh Circuit affirmed the injunction on appeal (*see infra* at Section B), and the district court thereafter granted permanent injunctive relief. *Id.*

ways that may never be known, and steal customers that may never be recovered. That alone establishes irreparable harm. *PepsiCo, Inc.*, 1996 WL 3965, at *30.

The irreparable harm element is also satisfied here for several additional reasons. First, Fleck *agreed* that Abbott will suffer "irreparable injury" and "shall be entitled to injunctions enjoining [any] breach or threatened breach" of the Non-Compete Provision or disclosure of Abbott's trade secrets. (Ex. C, § 11(d)); *see also OptionsCity Software, Inc.*, 2015 WL 3855622, at *5 (relying on employee's agreement that breach would cause irreparable harm); *Mickey's Linen v. Fischer*, Case No. 17 C 2154, 2017 WL 3970593, at *19 (N.D. Ill. Sept. 8, 2017). Second, irreparable harm can be presumed by Fleck's employment with a direct competitor in breach of his covenant. *See Mickey's Linen*, 2017 WL 3970593, at *18 ("Both federal and Illinois law . . . treat 'ongoing competition itself as a sufficient basis for relief.'") (citation omitted); *Tyler Enters. of Elwood, Inc. v. Shafer,* 573 N.E.2d 863, 866-67 (Ill. App. Ct. 1991). Third, irreparable harm also is presumed from Fleck's threatened disclosure of trade secrets. *See PepsiCo, Inc.*, 1996 WL 3965, at *29-30 ("In cases such as this, involving threats to trade secrets and confidential information, courts readily presume irreparable injury from a showing that the protectible interest at stake is imperiled by a defendant's conduct.").

Similarly, Abbott has no adequate monetary remedy, because "competitive position in an industry defies calculation," such that there would be "no way of calculating a reasonably precise level of pecuniary damage to [Abbott] for its loss of potential competitive position sustained by the disclosure of its trade secrets and confidential information." *Id.* at *30. Put another way, if the trade secrets are misappropriated, it will be extremely difficult, if not impossible, for Abbott to measure with precision what customers or market share it lost, and what it *would have* achieved, in the Chronic Pain Therapies market absent the misappropriation. *See id.*; (Ex. A, ¶ 22; Ex. B, ¶

22.) Moreover, even if Abbott could ultimately secure a monetary judgment sufficient to remedy its harm, it is unlikely it could collect a judgment of that magnitude from Fleck, an individual. That too favors injunctive relief. *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006); *Mickey's Linen*, 2017 WL 3970593, at *19.

## II. Abbott Has a Strong Likelihood of Success on the Merits.

As demonstrated below, Abbott's high likelihood of success on its claims against Fleck far exceeds the "better than negligible" threshold required to obtain a temporary restraining order. *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986) (citation omitted) (describing the threshold as "low").

### A. Abbott Is Likely to Succeed on Its Breach of Contract Claim.

Fleck has breached his Agreement because (1) the Agreement is a valid contract between Abbott and Fleck; (2) Abbott performed its obligations under the Agreement; (3) Fleck breached the Non-Compete Provision by accepting a marketing position with Nevro; and (4) Fleck's breach will cause Abbott harm. *See OptionsCity Software, Inc.*, 2015 WL 3855622, at *3.

It is indisputable that Fleck will undertake employment with Nevro – a "Competing Business" with a "Competing Product" – less than 12 months after his resignation from Abbott. (Ex. A, ¶¶ 8, 26.) And Fleck has confirmed that he will serve in a marketing role, which is "the same as or similar in function or purpose" to Fleck's role with Abbott. (*Id.* ¶ 28; Ex. C, § 9(a).) Fleck's anticipated employment with Nevro therefore falls squarely within – and breaches – the Non-Compete Provision. (Ex. C, § 9(a).) Finally, Fleck's threatened breach will harm Abbott by giving its direct competitor access to Abbott's entire strategic playbook for 2019 and beyond, and unfairly undermining Abbott's hard-earned competitive advantage. (Ex. A, ¶¶ 21-25, 30-34; Ex. B, ¶¶ 19-22; *supra* at 6-7.)

This situation is precisely why non-compete provisions like Abbott's (and non-disclosure provisions like Nevro's, *see* Ex. E, § 2) exist. Fleck agreed to lead the team developing Abbott's time-sensitive strategic plans for the next 12 to 18 months, knowing he would soon be walking over to Nevro's headquarters, with those plans in mind, to compete with Abbott. Fleck is not a regional sales representative whose valuable competitive knowledge can be neutralized by removing him from his sales territory for a limited period. Rather, Fleck knows the detailed roadmap that reveals how Abbott will market its Chronic Pain Therapies globally in 2019, and, unstopped, will now use that knowledge against Abbott. His Non-Compete Provision exists to prevent this exact thing from happening.[8]

*Lack of Undue Hardship to Fleck.* The Non-Compete Provision does not impose an undue hardship on Fleck as a matter of law because it does not prevent Fleck from earning a living. *See Brunswick Corp.* 784 F.2d at 275; *see also OptionsCity Software, Inc.*, 2015 WL 3855622, at *4-5 (granting temporary restraining order despite defendant's representation that the non-compete would "effectively preclude[] him from employment within his chosen field"). Fleck can use his marketing skillset and expertise to work in *any* marketing (or non-marketing) role, for *any* company, *anywhere* in the world, other than those that compete with Abbott in the Chronic Pain Therapies market. (Ex. A, ¶¶ 30, 35; Ex. B, ¶ 18.) Prohibiting him from doing so does not constitute undue hardship. To the contrary, permitting him to do so would reward his deceit.

*Lack of Public Injury.* While the public has an interest in free competition, it has an equally

---

[8] Even this restriction is for only 12 months, which is eminently reasonable. *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011); *OptionsCity Software, Inc.,* 2015 WL 3855622, at *2, *5 (18 month non-compete period was reasonable); *see also CertainTeed Corp. v. Williams*, 481 F.3d 528, 529-30 (7th Cir. 2007) (noting reasonableness of broad geographic scope restriction where competition in the market "is national if not international"); *Am. Transp. Grp., LLC v. Power*, No. 17 C 7962, 2018 WL 1993204, at *5 (N.D. Ill. Apr. 27, 2018) (activity restriction limited to competitive activity not unreasonable as a matter of law).

great – if not greater – interest in *fair* competition. Illinois courts have long held that enforcing reasonable restrictive covenants in competitive industries does not injure the public. *Lawrence and Allen, Inc. v. Cambridge Human Res. Grp., Inc.*, 685 N.E.2d 434, 443 (Ill. App. Ct. 1997) (no injury to the public in highly competitive industry); *Agrimerica, Inc. v. Mathes*, 524 N.E.2d 947, 952 (Ill. App. Ct. 1988) (public would not suffer from enforcing restrictive covenant in light of competitive pricing in the industry).

Abbott has shown a *strong* likelihood of success that Fleck breached the Non-Compete Provision by accepting employment at Nevro. Abbott is also likely to succeed on its claim for breach of the Non-Disclosure Provision, for the reasons discussed below regarding Abbott's claims under the Illinois Trade Secrets Act (ITSA) and the Defend Trade Secrets Act of 2016 (DTSA).

**B.      Abbott Is Likely to Succeed on Its ITSA and DTSA Claims.**

Irrespective of the Agreement, Fleck violated the ITSA and DTSA because (1) the 2019 Marketing Plan and 2019 Geographic Expansion Plan are trade secrets; and (2) his misappropriation of them is "[a]ctual or threatened." *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, at *3 (N.D. Ill. May 11, 2017) (ITSA claim requires (i) the existence of trade secret; and (ii) actual or threatened misappropriation).[9] Information is a trade secret if it is "sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS § 1065/2(d)(1)-(2); *see also* 18 U.S.C. § 1839(3) (similar).

---

[9] The Court may analyze Abbott's likelihood of success on its ITSA and DTSA claims together. *See Mickey's Linen*, 2017 WL 3970593, at *8 n.1. The only additional requirement under the DTSA – satisfied here – is that the trade secret relate to a product or service used in interstate commerce. 18 U.S.C. § 1836(b)(1); (Ex. A, ¶ 13.)

Abbott's 2019 Marketing Plan and 2019 Geographic Expansion Plan constitute trade secrets because Abbott maintains them as secret and confidential, and they derive economic value from not being known to Abbott's competitors. *See* 765 ILCS 1065/2(d); 18 U.S.C. § 1839(3). Even Nevro itself takes the position that "information regarding plans for . . . marketing and selling activities" constitutes confidential and trade secret information. (*See* Nevro July 30, 2018 Nondisclosure Agreement, attached as Ex. E, § 2.) This is precisely the type of information that the Seventh Circuit has recognized as trade secret – Abbott's plans for growing its market share, geographic expansion, pricing strategies, customer messaging, market and competitor analyses, product release strategies, etc. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270-71 (7th Cir. 1995) (employer entitled to preliminary injunction to prevent inevitable disclosure of trade secrets).

The Seventh Circuit's *PepsiCo* decision is dispositive. Similar to Fleck, the departing employee in *PepsiCo* was privy to Pepsi's "'Strategic Plan,' an annually revised document that contains [Pepsi's] plans to compete, its financial goals, and its strategies for manufacturing, production, marketing, packaging, and distribution for the coming three years." 54 F.3d at 1265. Analyzing this strategic plan, the Seventh Circuit noted that it "derives much of its value from the fact that it is secret and competitors cannot anticipate [Pepsi's] next moves." *Id*. The Seventh Circuit gave similar treatment to information regarding Pepsi's "pricing approach," recognizing that "[k]nowing [Pepsi's] pricing architecture would allow a competitor to anticipate [Pepsi's] pricing moves and underbid [Pepsi] strategically whenever and wherever the competitor so desired." *Id*. *See also, e.g., Mickey's Linen,* 2017 WL 3970593, at *9 ("pricing" and "marketing strategies"); *Mintel Int'l Grp., Ltd. v. Neergheen*, No. 08-cv-3939, 2010 WL 145786, at *11 (N.D. Ill. Jan. 12, 2010) ("marketing activities, projects, and initiatives"); *Lucini Italia Co. v. Grappolini*, No. 01 C 6405, 2003 WL 1989605, at *16 (N.D. Ill. Apr. 28, 2003) ("design and marketing plans");

*Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 412 (N.D. Ill. 2001) ("pricing data … and marketing strategies").

Like the information at issue in those cases, Abbott's strategic marketing plans give it an advantage in the market because they are secret and not generally known to Abbott's competitors. (Ex. A, ¶¶ 10, 15, 17.) If they were, competitors could "anticipate and undercut the effectiveness" of Abbott's strategies, while Abbott cannot do the same to its competitors absent improper and unfair conduct. *See Lucini Italia Co.*, 2003 WL 1989605, at *16 (marketing plans would be extremely valuable to competitors because "they would know Lucini's plans and strategies while Lucini would not know theirs"); (Ex. A, ¶¶ 21-25; Ex. B, ¶¶ 19-22.) For example, while in the normal course, it may take a competitor one or two quarters to develop a counter-message in response to an innovative Abbott marketing campaign – like one included in the 2019 Marketing Plan – a competitor tipped off to Abbott's marketing messages in advance could neutralize that campaign before it even begins. (Ex. A, ¶¶ 23, 34; Ex. B, ¶ 21.) Similarly, a competitor like Nevro, which has been in a market freefall, can use Fleck's knowledge of Abbott's pricing "pain points" to strategically discount its prices in the short-term to try to undercut Abbott's prices and steal its customers. *Brunswick,* 784 F.2d at 275; (*See* Ex. A, ¶ 19.)

For those reasons, Abbott treats the 2019 Marketing Plan and 2019 Geographic Expansion Plan as highly secret: they were developed by only a handful of people; are designated "Abbott Confidential, internal use only – Not to be reproduced, distributed or excerpted"; and are shared only with Abbott employees governed by non-disclosure obligations. (Ex. A, ¶¶ 15, 17; *see also* Ex. B, ¶¶ 10-12); *PepsiCo, Inc.*, 54 F.3d at 1265.

As in *PepsiCo, Inc.*, Abbott now "finds itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." 54 F.3d at

1270. The 2019 Marketing Plan and 2019 Geographic Expansion Plan inevitably "will enable [Nevro] to achieve a substantial advantage by knowing exactly how [Abbott] will price, distribute, and market its [Chronic Pain Therapies] and being able to respond strategically." *Id*. Abbott is therefore entitled to injunctive relief under the ITSA and the DTSA (irrespective of the Employee Agreement) to prevent inevitable misappropriation of these trade secrets. *See* 765 ILCS 1065/3(a); 18 U.S.C. § 1836(b)(3)(A)(i); *see also Mickey's Linen*, 2017 WL 3970593, at *8-9 (identifying elements of ITSA and DTSA claims).

    1. <u>Fleck Will Inevitably Use and Disclose Abbott's Trade Secrets.</u>

That Fleck will disclose Abbott's trade secrets is inevitable: unless Fleck "possesse[s] an uncanny ability to compartmentalize information, he would necessarily be making decisions about" Nevro's SCS product "by relying on his knowledge of [Abbott's] trade secrets." *PepsiCo, Inc.*, 54 F.3d at 1269; *YCA, LLC v. Berry*, No. 03 C 3116, 2004 WL 1093385, at *15 (N.D. Ill. May 7, 2004) ("Numerous cases in this court have [] followed *PepsiCo,* generally in marketing-related cases …") (citations omitted). Because of the high-level, strategic nature of the information in the 2019 Marketing Plan and 2019 Geographic Expansion Plan (as opposed to granular lists of specifications, names, or data), disclosure is inevitable regardless of whether Fleck has physical possession of these documents or a stated intention of not disclosing them. (Ex. A, ¶ 20; Ex. B, ¶ 19); *see also, e.g., PepsiCo*, *Inc.,* 54 F.3d at 1265; *YCA, LLC,* 2004 WL 1093385, at *16 ("[T]his sensitive marketing data . . . has now become part of [the employee's] general knowledge which the Court cannot expect him simply to forget."). As one court explained,

> the harm to the [employer] cannot be avoided simply by the former employee's intention not to disclose confidential information or even by his scrupulous efforts to avoid disclosure. The problem for [the employer] is that when [the employee] goes to [the competitor] he does not go with a *tabula rasa* with respect to [the employer's] products, its development strategies, its marketing plans, its customers and other significant business information. It is difficult to conceive how all of the

information stored in [the employee's] memory can be set aside as he applies himself to a competitor's business and its products. On the contrary, what [the employee] knows about [the employer] is bound to influence what he does for [the competitor], and to the extent it does, [the employer] will be disadvantaged.

*Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995).

### 2. Fleck's Lack of Candor Highlights The Inevitability of Disclosure.

Fleck's lack of honesty with Abbott demonstrates that disclosure is not only inevitable but intended. *PepsiCo, Inc.*, 54 F.3d at 1270 (employee's lack of forthrightness in the time period between when he accepted job and when he resigned "demonstrated a lack of candor . . . and proof of [his] willingness to misuse . . . trade secrets"); *Lakeview Tech.*, 446 F.3d at 656-58 (reversing denial of preliminary injunction where employee deceived employer about job search, offer of employment, and reason for leaving); *Mickey's Linen*, 2017 WL 3970593, at *13 ("history of deceit" discounted claim that employee would not divulge trade secrets). For *months,* Fleck concealed from Abbott that he was plotting to work for Nevro. (Ex. A, ¶¶ 26-29.) It cannot be a coincidence that Fleck resigned a mere *eight* days after finalizing Abbott's 2019 Marketing Plan. By concealing his discussions with Nevro, Fleck was able to obtain even more knowledge of Abbott's strategic plans to take with him. This history of deceit reflects that Fleck *does not want* to forget the strategic plans he helped develop, but rather that those trade secrets are what he intends to bring to Nevro. Fleck's duplicity, unless prevented, will allow him to capitalize on Abbott's investment by essentially selling Abbott's strategic plans to the highest bidder.

**III.    The Balance of Harms and Public Interest Favor Injunctive Relief.**

Courts should not reward this type of behavior. The balance of harms and the public interest likewise weigh heavily in favor of injunctive relief. The harm to Fleck of a temporary restraining order or preliminary injunction is minimal, at best. Abbott is *not* trying to prevent Fleck from leaving Abbott, or from taking another job. It is only seeking to restrict Fleck from

-14-

taking his knowledge of Abbott's strategic plans to a direct competitor. Fleck remains very employable by virtue of the extensive marketing skillset that he developed while working at Abbott, and Abbott will not seek to restrict employment Fleck undertakes outside the Chronic Pain Therapies market. (Ex. A, ¶ 35; Ex. B, ¶ 18); *Brunswick Corp.*, 784 F.2d at 275 ("very employable" employee would not be irreparably harmed by injunction). And after a year, he is free to do even that.

On the other hand, as demonstrated above, the irreparable harm to Abbott in the absence of injunctive relief is significant. *Brunswick Corp.*, 784 F.2d at 275 ("balance of irreparable harms weigh[ed] heavily" in employer's favor because employee's information would, among other things, "permit a competitor to preempt [the employer's] new products before they reached the market" and "to determine how aggressively it should price its products"). The public interest likewise tips the balance heavily for Abbott, as the public favors *fair* competitive practices. *PepsiCo, Inc.*, 1996 WL 3965, at *32 (granting preliminary injunction to further "vital public interests," including "fair competition, business innovation and economic efficiency").

## CONCLUSION

Fleck's employment with Nevro will cause Abbott irreparable harm absent immediate relief from the Court. Given the highly competitive nature of the Chronic Pain Therapies market in which both Abbott and Nevro operate, nothing short of a restraining order barring Fleck from working at Nevro will protect Abbott from irreparable harm. Accordingly, Abbott respectfully requests that the Court enter an Order:

- (a) Temporarily and preliminarily restraining and enjoining Fleck from employment with Nevro for a period of 12 months;
- (b) Temporarily and preliminarily restraining and enjoining Fleck from using or disclosing Abbott's trade secrets, including to Nevro;
- (c) Requiring Fleck to immediately return all Abbott property in his possession;
- (d) Awarding Abbott its attorneys' fees and costs; and
- (e) Awarding all such further relief as may be appropriate.

Dated: October 15, 2018								Respectfully submitted,

/s/ *Ronald S. Safer*
Ronald S. Safer, ARDC # 6186143
Harnaik Singh Kahlon, ARDC # 6280309
Mariangela M. Seale, ARDC # 6293433
Tal C. Chaiken, ARDC # 6308729
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
Phone: 312-471-8700
Fax: 312-471-8701
Email: rsafer@rshc-law.com
		nkahlon@rshc-law.com
		mseale@rshc-law.com
		tchaiken@rshc-law.com

*Attorneys for Plaintiff Abbott Laboratories*